Gerald K. FIELDS, Respondent,

v.

KANSAS CITY, Missouri, a municipal corporation, Appellant.

No. 23878.

Kansas City Court of Appeals.

Missouri.

Feb. 3, 1964.

Herbert C. Hoffman, City Counselor, Robert A. Meyers, Associate City Counselor, Timothy D. O'Leary, Asst. City Counselor, Kansas City, for appellant.

Robert L. Robertson, Kansas City, Marvin Pollard, Ludlow, Walter A. Raymond and Raymond, West & Cochrane, Kansas City, for respondent.

CROSS, Judge.

The defendant city appeals from a judgment entered on a jury verdict awarding plaintiff damages in the sum of $14,000.00 for personal injuries sustained when he fell into an uncovered sewer manhole in a public alley.[1]

Plaintiff resides in Ludlow, Missouri, and is a construction worker. As such, his particular duties have been the operation of a crane or bulldozer. He testified that on September 5, 1956, he was working on the Sixth Street Trafficway then under construction in Kansas City. On the evening of that day, after working overtime, he went to his apartment on West Thirteenth Street. He "took a shower and cleaned up and made a telephone call" to his brother-in-law, Harold Richey, at Ludlow. Plaintiff informed Richey, who was then out of work, that he might get a job with plaintiff's employer. To that end it was arranged that the two men meet at the town of Polo later that night.

Thereafter plaintiff went to the 111 Club, a tavern located on the south side of Thirteenth Street about midway between Walnut Street and Grand Avenue. He stated that some of his friends and co-workers were patrons there and that he thought he could pick up one of them to ride with him to Polo for company. In proceeding to the club plaintiff drove his car east on Thirteenth Street, turned south into the alley immediately next to the tavern, and drove southward in the alley about 80 feet to a parking lot which was located immediately next to and east of the alley. After parking his car in a space close to the alley, plaintiff walked north back up the alley and went inside the club. It was then about 8:15 o'clock and still daylight.

---

1. This is the second appeal in the case. The first appeal arose from a former trial and is reported in 358 S.W.2d 96.

While in the club, plaintiff ate two sandwiches and drank two vodka Collinses. None of the men he was looking for came in the place, and shortly after 10:00 o'clock he left alone to get his car and drive to Polo. It had then become dark.

During the time plaintiff was in the tavern employees of the city had removed the cover of a manhole which was located in the center of the alley and about 20 feet south of the sidewalk, in order to flush the sewer with water—an operation directed by the Chief of the Fire Prevention Department of the city for the purpose of dissipating gas vapors which were present in the area. After one flusher truck tank of water had been put into the sewer, the driver drove away to refill his truck for further flushing of the sewer, but upon his departure he left the manhole uncovered. Such was its condition when plaintiff went to get his car. There were no warning lights in the alley, no barricades around the hole and no employee was posted to warn pedestrians that the hole was open.

After leaving the tavern plaintiff walked east to the alley, and south along it until he reached the location of the manhole. He testified that he couldn't see the manhole and fell into it. He stated, "I fell in practically up to my waist, and as I fell, I caught myself with my arms, and it gave me a jerk and twisted my back, and I thought my knee was broke—or my leg —at the time". After receiving the fall plaintiff drove to Polo to see Richey in accordance with the telephone arrangement. By that time Richey had left Polo and plaintiff drove on to Ludlow, where he found Richey. Plaintiff returned to Kansas City that night as a passenger in his automobile. Richey did the driving, at plaintiff's request, because his leg and back were causing him distress. On the following day, September 6, 1956, plaintiff went to the hospital for treatment of his injuries, the nature of which will be noted hereinafter.

It is undisputed that the sidewalk along Thirteenth Street to Grand Avenue and thence south on Grand Avenue to the front entrance of the parking lot was well lighted and that the way along such route was clearly visible. However, the evidence of the parties is at variance respecting the lighting and visibility conditions existing in the alley. Plaintiff testified the alley was in the shadow of buildings, that it was so dark he did not see any object lying in the alley, and, as we have noted, that he couldn't see the open hole, as he walked down the alleyway. On behalf of defendant, L. L. Baughman, who lived on Thirteenth Street just north across the street from the alley, testified that the alley was lighted well enough to see objects on the ground in the alley, that it "wasn't hard to see", and that you can see the manhole there. He also testified that other people "around in that vicinity" used the alley south of Thirteenth Street; that "they got their cars back down there and they go down the alley, a shortcut to get the cars out" * * * "They go down the alley to get to the parking lot to get the cars, instead of going down Grand the long way around, they cut down through the alley". John D. McGuire, who operates a business at 1234 Grand Avenue, testified on behalf of defendant that he used the alley at night time for many years; that he would park his car in the alley and walk through it to his place of business. Mr. McGuire stated that the lighting in the alley was "pretty good", that "there was light enough to see where you were going", and that the manhole was visible from the street.

Plaintiff's case was submitted on the theory that defendant was negligent in leaving the manhole open, uncovered, unguarded and unprotected, and that the alley was thereby rendered not reasonably safe for travel. The city defended the case on the theory that plaintiff was guilty of contributory negligence which directly caused or contributed to cause his fall and injury. This issue was submitted to

the jury by instruction No. 9 which the trial court gave at defendant's request and which essentially told the jury that their verdict must be for defendant if they found that plaintiff saw or by the exercise of ordinary care could have seen the open manhole in time to have stepped around the same in safety by the exercise of ordinary care, but failed to do so, and that plaintiff was thereby negligent, and that such negligence caused or directly contributed to his fall and injury.

No contention is made on behalf of the defendant that plaintiff failed to establish a submissible case of negligence or that the city was not negligent in leaving the manhole uncovered under the circumstances in evidence.

■ In defendant's first point the trial court is charged with error in refusing to give an additional instruction on contributory negligence, to-wit, defendant's requested instruction No. 12, quoted as follows:

"The Court instructs the jury that if you find and believe from the evidence that on September 5, 1956, between 10 P.M. and 11 P.M., the plaintiff left the 111 Club and walked down the alley in question, and if you further find that at said time there were no street lights or other artificial sources of light which illuminated said alley at the location of the manhole in question, if you so find, and that said alley at said location was so dark that plaintiff could not distinguish the surface of the alley, if you so find, and plaintiff fell into an open manhole therein, and if you further find that a reasonably safe and lighted sidewalk was available on 13th Street and on Grand Avenue for plaintiff's use but he chose to walk down the alley, and if you further find that plaintiff in choosing to walk in the alley under the conditions submitted above was

negligent, and if you find such negligence directly caused or contributed to cause plaintiff's injuries, then your verdict must be for the defendant".

Pertinent to the question at hand is the following statement from 63 C.J.S. Municipal Corporations § 852, p. 205:

"Where a person voluntarily elects to travel along a route which he knows to be unsafe or obviously dangerous, with knowledge of another safe and convenient way, he thereby assumes the risk of the chosen way, and, if he is injured while traveling thereon, he is guilty of contributory negligence precluding a recovery, as where, knowing of the dangerous condition of a sidewalk, he elects to walk thereon when he could have avoided the accident by taking the opposite side of the street which was safe, or by walking in the roadway, or by walking to one side of the obstruction or defect.

\* \* \* \* \* \*

"The above rule does not apply where the injured person had no knowledge of a safer route. *Moreover, the rule applies only where the danger is so great and apparent that an ordinarily prudent person would regard it as dangerous and avoid it,*[2] or, as has been held, where unusual conditions exist; and the mere fact that the way he used was defective or obstructed, and that there was another and safer way which he might have taken, does not per se establish contributory negligence, if he exercised ordinary care, in accordance with the conditions existing at that place". (Emphasis ours.)

In Stephens v. City of Eldorado Springs, Mo.App., 190 S.W. 1004, the court said, "Defendant's instruction No. 9 was refused, and this it is claimed was error. The instruction, in effect, unqualifiedly declared that if plaintiff, by taking a roundabout

2. Citing Harding v. City of St. Joseph, 222 Mo.App. 749, 7 S.W.2d 707.

way, could have avoided the defective place, he was guilty of contributory negligence in failing to do so. This is not the law. Graney v. City of St. Louis, 141 Mo. 180, 184, 42 S.W. 941. A person is not bound to abandon his customary route of travel in a public street because of a defect therein, unless the defect is so patently dangerous that no ordinarily prudent and careful person would attempt to pass over it. (Citing cases.)"

In Morgan v. City of Kirksville, Mo. App., 179 S.W. 755, the court stated: "Defendant's instruction No. 3 told the jury that, if the walk was dangerous, and plaintiff knew it was dangerous, or could have known it by the exercise of ordinary care, and yet negligently attempted to walk on it and suffered injury, she is not entitled to recover. The trouble with this instruction is that it makes the mere attempt to walk over it negligence, when, as we have seen, negligence can arise only in the manner in which she went over it if the walk was not glaringly dangerous. Of course, if it was so glaringly dangerous that an ordinarily prudent person would not have used it, and plaintiff knew of the defect, then the mere attempt to use the walk was negligence; but the instruction said nothing about such a state of affairs. These errors in the instructions should be avoided upon the next trial". Also see Newberry v. City of St. Louis, 335 Mo. 1, 70 S.W.2d 546; Seniff v. City of Hannibal, Mo.App., 245 S.W. 197; Harding v. City of St. Joseph, 222 Mo.App. 749, 7 S.W.2d 707.

In view of the foregoing authority, it is our conclusion that instruction No. 12 should have required a finding to the effect that the way along the dark alley was so glaringly dangerous that an ordinarily careful person in the exercise of ordinary care would not have attempted to enter it. Such finding is a necessary predicate of an ultimate finding that plaintiff was contributorily negligent. Since there was neither proof of this necessary element nor inclusion thereof in the instruction, we are constrained to rule that it was erroneous, at least in the respect we have noted. Therefore the trial court was justified in refusing the instruction.

In urging the propriety of instruction No. 12, defendant relies principally upon a statement of the court made in Sanders v. Carl Berry Oil Co., Mo.Sup., 359 S.W. 2d 769, that "We conclude that under the facts and attending circumstances a jury could reasonably find that when plaintiff entered the alley in total darkness at three o'clock in the morning when a safe and lighted sidewalk was available for his use he did not exercise the care of an ordinary reasonable and prudent person. * * The trial court was correct in ruling that whether or not plaintiff was guilty of contributory negligence was a jury issue". We do not believe that the quoted statement constitutes any authority that instruction No. 12 in this case is a proper instruction. The Sanders ruling goes no further than to hold that the question of plaintiff's contributory negligence was a jury issue under the facts in that case. It is noteworthy that in the Sanders case the court also ruled that the instruction which submitted the issue of contributory negligence was erroneous—as we have ruled in this case—but for different reasons. We find nothing in Sanders which abrogates or limits the effect of the authority we have heretofore noted defining the requirements of an instruction on contributory negligence involving a pedestrian's choice of ways.

■ Defendant next contends that the verdict is excessive and that the court erred in not requiring a substantial remittitur. In considering this question, we shall observe the rule that "all reasonable presumptions are to be indulged in favor of the verdict and the evidence must be viewed favorably to the verdict". Brown v. Moore, Mo.Sup., 248 S.W.2d 553.

The evidence favorable to the verdict is, in part, as follows: At the time of trial,

plaintiff was 44 years old. Prior to his fall in the manhole he was engaged in operating heavy machinery and farming in off seasons. He had done heavy work all his life. For recreation he hunted and fished. Previous to this accident, his years of heavy work had resulted in a back condition which the doctors described as a narrowing of the lumbosacral interspace between the fifth lumbar vertebrae and the sacrum. As to any previous trouble with his back plaintiff said "Maybe I got a catch but it never amounted to anything". There is no evidence of any previous disability in plaintiff's right knee. There is, however, abundant evidence from which the jury could reasonably find that plaintiff suffered serious and permanent disabling injuries to his right knee and additional injury and disability in his back as a result of his fall in the manhole.

When plaintiff fell he severely twisted or wrenched his right knee. Examination of the knee on the following day by Dr. Overesch, who testified on plaintiff's behalf, revealed an effusion of the right knee joint —a large swelling or collection of fluid which was severely painful on palpation and weight bearing. The injury was diagnosed as a tear of the medial collateral ligament of the right knee joint. Dr. Overesch administered medication and placed a plaster of Paris cylinder cast on plaintiff's right leg from the upper thigh to the ankle. Plaintiff wore the case three weeks, after which he wore an elastic bandage and a knee cage brace, and received further treatment by Dr. Overesch consisting of medical injections, massage and physiotherapy. From later X-ray examination of plaintiff's right knee Dr. Overesch found that the healing process had caused formation of a calcific deposit opposite the right medial femoral condyle of the knee in the area where the ligament attaches, which has resulted in permanent residual disability of his right knee, in that the elasticity of the torn ligament is impaired, there is general laxity and looseness of the ligaments around the joint, crepitation is

present, and the knee has been rendered more susceptible to future injury. Pain and tenderness in the knee joint have persisted. These conditions affect plaintiff in walking, have interfered with his work, are permanent, and cannot be relieved by surgery. These findings and opinions of Dr. Overesch are essentially corroborated by Dr. Dowell, who also examined and treated plaintiff. And, it is revealed by the testimony of defendant's medical witness, Dr. Pickard, that the healing of the torn knee ligament was abnormal in that the calcification deposit is excessive, and that, "this bony deposit can actually be felt with your fingers". Dr. Pickard admits that plaintiff walks with a limp, has a "weak, unstable knee which probably will go on being this way", and that "this weakness is due to this injury."

We have previously noted that plaintiff testified that as he fell, "I caught myself with my arms and it gave me a jerk and twisted my back"; also that his back was causing him pain and distress that night. He further testified that the knee injury was paramount and was his chief concern at first, but that as time went on his back became more painful until, in November of 1957, he consulted Dr. Dowell of Chillicothe for examination and treatment. Plaintiff was hospitalized and his back was placed under traction for six days. His complaints were of pain and stiffness in his entire back and also in his right knee. Dr. Dowell diagnosed plaintiff's back condition as a scoliosis or misalignment of the spine caused by an abnormal weight stress, pointing out that plaintiff has a weak, unstable and painful knee which he is obliged to favor; that this has thrown the weight bearing parts of his body out of line; and, that because of plaintiff's large size (6 feet 2 inches in height, 252 pounds in weight) a heavy, twisting strain was put upon his back which would necessarily render it sore and painful. In Dr. Dowell's opinion the stress and shift of weight caused by the knee injury would aggravate plaintiff's prior back condition and cause it to grad-

ually grow worse. He testified that plaintiff's present back complaints and knee injury were, in his opinion, severe, and that the fall in the manhole "triggered the whole thing".

The findings of Dr. Dowell relative to plaintiff's back are corroborated by Dr. Overesch. By later examination, Dr. Overesch found that new areas of bone, "little bony spurs or spicules" had been deposited in the upper lumbar spine area of plaintiff's back—a sclerotic condition—which was an indication of abnormal weight bearing stress and is "a reaction of the bone to that stress". In the doctor's opinion plaintiff's prior back condition was "undoubtedly aggravated by his fall and injury to the knee". Upon examination of plaintiff two days before the trial he found definite limitation of motion in plaintiff's back accompanied by pain upon bending; also tenderness in the lower back area upon palpation. Stating his opinion of plaintiff's residual injuries, Dr. Overesch testified:

"It is my opinion that this patient has—presents residual disability in his right knee, particularly as a result of the tear of this medial ligament, with its healing by calcific deposit, which is shown by the X-ray. He has the restriction of the knee-joint motion, and laxity or looseness of the ligaments about the joint. He also has the pain and tenderness, which has persisted. It is felt that this knee injury was caused on his body by this accident of September 5, 1956. In the back, he has a degenerative disc. He has narrowing of the joint space. He has some bony reaction about that area. He has continued complaints of pain in the back. It is felt that some of these X-ray changes were present to a certain degree when he was injured, and that these have been aggravated by his injury or trauma that he had on September 5, 1956".

It is Dr. Overesch's opinion that the described conditions are likely to produce pain and are permanent.

Since plaintiff was injured his knee has been painful, weak and unstable. It occasionally gives way on him and causes him to fall. It has made him "more awkward" and he can't do much walking. He has had to give up hunting and any fishing which requires walking. He can no longer operate a bulldozer because of the knee injury. Instead, he operates a crane "but that still causes it to hurt". Plaintiff testified: "At night after using it all day it hurts"—"A lot of nights it pains me terrible". The pain interferes with his sleep and rest. His foreman, Ray Donoho, testified that "he is not capable at times of moving the machines and handling what he is supposed to do" and had to "shut down" and quit work for rest and relief from back and leg pain. According to Donoho, plaintiff lost three to four days' work out of each month since the accident.

Plaintiff further testified that as time goes on his back and his knee pain him "a lot worse" and that the pain interferes with his work; that he has lost on the average of "at least two days a month out of twelve months a year—on account of my back and my knee"; and, that his take home pay was approximately $21.00 per day. At the time of trial plaintiff had a life expectancy of twenty-six years.

■ There is no exact standard of measure by which the money value of personal injuries can be gauged. As courts frequently say, each case must be considered upon its own peculiar facts. Having so considered this case we reach the conclusion that the verdict of $14,000.00 is not excessive. The plaintiff was only 38 years at the time of the casualty. He suffered injuries which for several years past have caused him pain and will continue to do so for his expectancy of 26 years. Under the evidence his loss of wages for that period alone could be computed by the jury as a

sum of at least $13,000.00. Even under defendant's view that plaintiff would be employed in construction work only half the year, his expectancy wage loss alone would amount to at least $6,500.00. Plaintiff's injuries have rendered him unable to walk with stability or security and have deprived him of recreational pleasures.

Two juries have considered the question of plaintiff's entitlement to damages. The first jury verdict, rendered two and one-half years prior to the verdict in this case, awarded plaintiff $10,000.00. The award in this case exceeded the first verdict by $4,000.00. But, it may be considered that plaintiff had suffered additional pain in the interim of two and a half years, and had lost additional wages during that period of time. These facts have some bearing on the question at hand, because it is primarily the function of the jury to assess an award of damages. The jury is in a better position to measure the reasonableness of the verdict than is the appellate court, where it should not be reduced unless, as a matter of law, the amount is more than the evidence will support.

In reaching our conclusion that the verdict should not be disturbed, we have given due consideration to defendant's extensive arguments on the question, and to the cases it cites. We have not found the former sufficiently persuasive, or the latter of sufficient applicability to warrant a decision that the verdict is excessive.

■■ Defendant's final point is a contention that the trial court erred in giving plaintiff's instruction No. 4, which is a measure of damage instruction, conventional in form and content. Defendant made only a general objection to giving the challenged instruction at the trial and its motion for a new trial does not contain the specific allegations of error presently asserted against the instruction. Consequently, the alleged error in the giving of instruction No. 4 has not been preserved for appellate review. Civil Rule 70.02; Civil Rule 79.03, V.A.M.R.; O'Brien v. City of St. Louis, Mo.Sup., 355 S.W.2d 904; Wren v. St. Louis Public Service Co., Mo.App., 355 S.W.2d 365. However, we have examined the instruction, and considered it in connection with the charges lodged against it in defendant's brief, in order to determine whether there exists plain error affecting substantial rights which we may consider in our discretion pursuant to Civil Rule 79.04 V.A.M.R. There is no such error in the instruction or in the action of the trial court in giving it.

The judgment is affirmed.

All concur.